**AIKEN SCHENK HAWKINS & RICCIARDI P.C.**
2390 E. Camelback Road
Suite 400
Phoenix, Arizona 85016-3479
Telephone: (602) 248-8203
Facsimile: (602) 248-8840
E-Mail: docket@ashrlaw.com
E-Mail: awr@ashrlaw.com
E-Mail: jc@ashrlaw.com
E-Mail: sml@ashrlaw.com

Alfred W. Ricciardi - 009547
James M. Cool – 028023
Stephanie McCoy Loquvam - 029045
Attorneys for Plaintiffs Estella Medrano
and L.V.

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Estella Medrano, Individually; L.V. A Minor Child, Individually,<br><br>Plaintiffs,<br>v.<br><br>The City of Phoenix, A Political Subdivision of The State of Arizona, Phoenix Police Department, Joe Yahner, Acting Chief of Police and Jane Doe Yahner, Husband and Wife, Robert Diventi and Jane Doe Diventi, Husband and Wife; David Hough and Jane Doe Hough, Husband and Wife; Aaron Kriss and Jane Doe Kriss, Husband and Wife; Benjamin Denham and Jane Doe Denham, Husband and Wife; Pamela Zielin and John Doe Zielin, Wife and Husband; Mykel Moller and Jane Doe Moller, Husband and Wife; John Does I-X; Jane Does I-X Black and White Corporations I-X; ABC Partnerships I-X,<br><br>Defendants. | CASE NO:<br><br>**COMPLAINT**<br><br>**CIVIL RIGHTS ACTION<br>(42 U.S.C. § 1983)<br>JURY TRIAL DEMANDED** |

Plaintiffs Estella Medrano ("Ms. Medrano") and L.V. ("L.V,") collectively, "Plaintiffs"), by and through undersigned counsel, state the following Complaint against Defendants:

**JURISDICTION AND VENUE**

1. Plaintiffs bring this action under the Civil Rights Act, 42 U.S.C. §§ 1983, 1985, and 1988.

2. This Court has jurisdiction pursuant to 28 U.S.C § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws, or treaties of the United States, and 28 U.S.C. § 1343(a), which gives district courts jurisdiction over actions to secure civil rights extended by the United States government.

3. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) because the events that gave rise to the Complaint occurred in this district.

## PARTIES

4. Plaintiffs reside in Maricopa County, State of Arizona.

5. Ms. Medrano is an unmarried adult woman; L.V. is Ms. Medrano's minor child.

6.

7. Defendant City of Phoenix (hereinafter "City") is a political subdivision of the State of Arizona that acts through its employees, agents, and independent contractors.

8. Defendant Joe Yahner and Jane Doe Yahner (hereinafter "Yahner") are husband and wife who at all times alleged herein were acting on behalf of the marital community and resided in Maricopa County, State of Arizona.

9. At all times material hereto, Defendant Yahner was the acting Chief of Police for the City of Phoenix Police Department ("PPD") with ultimate authority to control and responsibility for the actions of its officers and agents, and with the authority and responsibility to establish policies, practices, customs, procedures, protocols, and training for the PPD. Joe Yahner is named herein in both his official and individual capacities.

10. Defendants Robert Diventi, David Hough, Aaron Kriss, Pamela Zielin, Benjamin Denham, and Mykel Moller (the "Police Officer Defendants") are, upon information and belief, married and were acting (at all times) on behalf of and for the benefit of their respective marital communities and resided in Maricopa County, State of Arizona.

11. At all times alleged herein, the Police Officer Defendants were employed by

2

the PPD and were acting under the supervision and control of acting police chief, Yahner.

12. The Police Officer Defendants were, at all times alleged herein, acting within the course and scope of their employment, for the benefit of their employer, and as agents of the City and PPD.

13. Acting individually and in concert and/or with common knowledge, the Police Officer Defendants took actions or failed to take actions and their actions or inaction caused Plaintiffs the injuries alleged herein.

14. Fictitiously named Defendants, John and Jane Does I-X, Black and White Corporations I-X, and ABC Partnerships I-X, upon information and belief, are liable for the acts complained of herein, but whose true identities are unknown to the Plaintiffs. Plaintiffs will request the Court's leave to amend their Complaint to insert the true names of the fictitiously-named Defendants when said names are known to Plaintiffs, and to amend these allegations as appropriate.

15. Each of the Defendants conspired, acted pursuant to a joint venture, and acted in concert with each other to commit the wrongful conduct alleged herein.

16. Defendants engaged in a pattern of unlawful and tortious activity as a *de facto* association and/or enterprise with a common purpose.

17. Each of the Defendants conducted or participated (directly or indirectly) in the common *de facto* association and/or enterprise.

18. The City is liable for all acts and omissions of its employees, agents, and independent contractors because of their non-delegable duties and the doctrine of vicarious liability.

**FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**

19. On May 18, 2011, Mrs. Medrano was 23 years old. Her daughter, Plaintiff L.V., was approximately six weeks old.

20. On May 18, 2011, Ms. Medrano celebrated her younger brother's graduation from middle school and watched a movie with family at her grandmother's house. Ms.

3

Medrano spent the evening alone with her newborn daughter at their home near South Mountain.

21. Just after 10:00 p.m. on May 18, 2011, unbeknownst to Ms. Medrano, a Hispanic male in dark clothing and a Hispanic female robbed a Circle K convenience store at gunpoint near 73rd Avenue and Thomas Road and fled on foot.

22. The entire robbery was captured on the Circle K's closed-circuit security surveillance system.

23. The only eye-witness to the robbery was the store's clerk, Jagmeet Bains.

24. When the perpetrators fled the scene, Mr. Bains called 911.

25. PPD responded to the 911 call and began to search for the suspects in the vicinity of 73rd Avenue and Thomas Road.

**A. AN INVESTIGATION THAT BEGINS AND ENDS WITH ESTELLA MEDRANO**

26. PPD Officers Robert Diventi (# 8593) and Aaron Kriss (#8423) were the first officers to arrive on scene at the Circle K.

27. PPD Officer David Hough began to search for the suspects in the vicinity of 73rd Avenue and Thomas Road.

28. Officers Diventi and Kriss left the scene to assist Officer David Hough (#9267) in his pursuit of two suspects: an unidentified Hispanic male in dark clothing and a "heavyset Hispanic female" wearing a red Arizona Diamondbacks pullover sweater.

29. When the suspects were spotted by Officer Hough, they ran in different directions.

30. Once the suspects ran in different directions, Officer Hough chased the male suspect on foot. Officer Hough did not pursue the female suspect.

31. Ultimately, Officer Hough lost sight of both suspects without apprehending either.

32. Approximately one hour later, PPD officers found the male suspect—later

4

identified as Miguel Hernandez—hiding in a backyard shed in the neighborhood surrounding the Circle K.

33. Officer Hough arrested Mr. Hernandez and read him a *Miranda* warning.

34. Mr. Hernandez invoked his right to remain silent and said nothing to PPD investigators about the crime or his female accomplice.

35. Officer Hough collected (as evidence) a red Arizona Diamondbacks pullover sweater after finding it discarded beside a tree near the scene of the crime.

36. The red Diamondbacks sweater matched the description of the sweater worn by the female accomplice in the Circle K robbery.

37. Upon information and belief Officer Hough and PPD officers did not inspect or test the red Diamondbacks sweater for hairs or any other traces of the suspect's DNA.

38. To this day, upon information and belief, the sweater remains in the custody of the PPD, held as evidence in the robbery, but the PPD has never inspected or tested it for hairs or other DNA.

39. After Mr. Hernandez was apprehended, and while Officer Hough and others searched the surrounding area for additional evidence and Mr. Hernandez's female accomplice, Officer Diventi returned to the Circle K.

40. When he returned to the Circle K, Officer Diventi watched surveillance video of the robbery with the store's clerk, Jagmeet Bains. Based solely on his review of the surveillance video, Officer Diventi radioed the following description of the female suspect to his fellow officers:

> *Medium complexion Hispanic female; age 25-30 years old; Height 5'5", Weight: 180, [with] long black hair pulled back into a ponytail, red Diamondbacks sweatshirt, blue jeans, white shoes, and a black purse on her right shoulder.*

41. After watching the surveillance video and transmitting the description of the unidentified female accomplice over the radio, Officer Diventi interviewed Mr. Bains about the armed robbery.

5

42. After completing his interview of Mr. Bains, Officer Diventi processed the interior of the Circle K for physical evidence.

43. Based on his review of the surveillance video, Officer Diventi collected possible fingerprints from the cash drawer touched by Mr. Hernandez and a charity donation box touched by his female accomplice.

44. PPD officers later matched the fingerprint found on the cash drawer to Miguel Hernandez.

45. The PPD was unable to match the fingerprint on the charity donation box to any person.

46. On May 19, 2011, PPD Sergeant Moller (#7717) instructed Officer Thomas Baker (#9431) to attempt to identify the female suspect.

47. Officer Baker interviewed Officer Hough who avowed to Officer Baker that he had seen the female suspect's face as she fled from him and could positively identify her.

48. Officer Baker ran a search for Mr. Hernandez's known associates; among those listed in the results was Mr. Hernandez's ex-wife, Ms. Medrano.

49. According to Arizona Department of Transportation Motor Vehicle Division ("MVD") records, Ms. Medrano was described a Hispanic female, 5'7", 175 pounds.

50. Ms. Medrano's MVD photo was taken approximately four years earlier (when she was 19 years old), the physical description in the MVD records was based on her appearance at that time.

51. Officer Baker printed Ms. Medrano's photograph from the MVD database.

52. Officer Baker presented Ms. Medrano's MVD photo (by itself) to Officer Diventi and asked if the photo matched the suspect Officer Diventi had seen on the surveillance video.

53. After looking at the single picture of Ms. Medrano, Officer Diventi told Officer Baker that Ms. Medrano was "definitely the outstanding suspect."

54. Officer Baker then created a photo line-up including Ms. Medrano's MVD

photo and presented the line-up to Officer Hough.

55. Officer Hough identified Ms. Medrano's MVD photo as matching the female suspect that fled from him on foot the night of the robbery.

56. Before making their respective photo identifications, Officer Hough did not see the surveillance video and Officer Diventi did not see the suspect in person.

57. Before making their respective photo identifications, neither Officer Hough nor Officer Diventi had ever seen Ms. Medrano in person.

58. Later, Officer Diventi presented the same photo lineup shown to Officer Hough to Mr. Bains.

59. Mr. Bains was the only person to see Mr. Hernandez's female accomplice face-to-face and close-up.

60. Mr. Bains did not identify the photo of Ms. Medrano in the photo line-up as the person he believed most resembled the female accomplice; he selected a different photograph in the photo line up.

61. Without a positive eyewitness identification and without any DNA evidence, the PPD began surveillance on Ms. Medrano's grandmother's home in an effort to locate and arrest Ms. Medrano.

62. At approximately 8:00 a.m. on May 21, 2011, PPD officers Benjamin Denham (#7757) and Pamela Zielin (#8274) arrested Ms. Medrano outside of her grandmother's house.

63. The officers advised Ms. Medrano why she was under arrest and told her that she had the right to remain silent and the right to a lawyer.

64. Ms. Medrano immediately told the police:

> "She was not involved in the armed robbery. She has not seen [Miguel] for at least two weeks. They dated in the past, however are not together right now. She never entered the Circle K that night and she never had contact with the clerk. She denied running from officers who arrived on scene. She heard about Miguel being arrested from his mother, and believes **Miguel's new girlfriend is the one involved.** She only knows that Miguel's new girlfriend's name is Christina [Ruelas] and she is a Hispanic female. She continued to deny any involvement, and believes it

7

was another female **who just looked like her**."

65. From the moment she was arrested, Ms. Medrano cooperated fully with the PPD's investigation of the armed robbery.

66. Ms. Medrano immediately and voluntarily provided fingerprint and DNA samples to PPD officers at the South Mountain station.

67. When Ms. Medrano was booked into the jail, her belongings were seized and inventoried.

68. Among the items in Ms. Medrano's possession when she was arrested was her driver's license, bearing the same photo officers Hough and Diventi had used to identify her as the female suspect in the armed robbery.

69. In her MVD photo, Ms. Medrano was 19 years old and weighed approximately 175 pounds.

70. At the time of her arrest on May 21, 2011, Ms. Medrano was 23 years old and weighed more than 200 pounds.

71. Ms. Medrano had given birth to her daughter, L.V., just six weeks before her arrest.

72. Ms. Medrano repeatedly told PPD officers and jail personnel that she did not commit the Circle K robbery and that the unidentified female accomplice was Mr. Hernandez's then-current girlfriend, Christina Ruelas.

73. Ms. Medrano's defense counsel and Ms. Medrano's grandmother also identified Mr. Ruelas to PPD officers as Mr. Hernandez's female accomplice.

74. After arresting Ms. Medrano based on a MVD photo identification by officers Hough and Diventi, PPD officers did not review the surveillance video to confirm that Ms. Medrano indeed looked like the female accomplice to the armed robbery.

75. The PPD investigators never asked Mr. Bains if Ms. Medrano, as she appeared on May 23, 2011, resembled the female accomplice to the armed robbery.

76. Upon information and belief, the PPD did not investigate Ms. Ruelas as a

8

suspect in the armed robbery, did not examine her relationship with Mr. Hernandez and did not include her photo in a line-up or otherwise present her to Mr. Bains or Officers Hough and Diventi.

77. While Ms. Medrano was in police custody, the PPD acquired evidence that the female accomplice in the surveillance video was Christina Ruelas, Mr. Hernandez' then-current girlfriend.

78. Despite evidence of Ms. Ruelas' involvement in the crime, she has not, to this day, been arrested or prosecuted for her role in the Circle K armed robbery.

### B. WRONGFULLY ARRESTED, MS. MEDRANO SPENDS SIX MONTHS IN CUSTODY WHILE HER NEWBORN DAUGHTER YEARNS FOR HER MOTHER.

79. Estella Medrano was held in the Maricopa County Jail on charges of Armed Robbery from May 21, 2011 until August 10, 2011.

80. Several months after Ms. Medrano's arrest, while she was still in police custody, the PPD's lead case agent told Ms. Medrano's defense counsel that the PPD was "70% sure" that Ms. Medrano was not involved in the armed robbery.

81. Yet, Defendants continued to hold Ms. Medrano in custody and the County Attorney objected to her release from jail and continued its prosecution of Ms. Medrano.[1]

82. On August 10, 2011, over the objections of the County Attorney, Ms. Medrano was released from jail and placed on home arrest under the supervision of Pre-Trial Services.

83. While she was on home arrest, Ms. Medrano's defense counsel and/or her investigator(s) contacted Christina Ruelas' father.

84. Upon information and belief, Ms. Ruelas' father positively identified his daughter as the female accomplice to the armed robbery on the Circle K surveillance video.

85. Ms. Medrano's counsel informed the County Attorney of the identification made by Ms. Ruela's father.

---

[1] For the purposes of this Complaint, the office of the County Attorney of Maricopa County, Arizona, including its agents/attorneys are collectively referred to as the "County Attorney."

9

86. On November 3, 2011, Ms. Medrano was released from custody and cleared of all charges.

87. Ms. Medrano was incarcerated during a crucial formative period in her daughter's life.

88. During Ms. Medrano's incarceration, her newborn baby, L.V., had little or no contact with her mother.

89. While Ms. Medrano was incarcerated, her aunt cared for L.V.

90. In jail, Ms. Medrano suffered from debilitating depression due to the separation from her child.

91. Ms. Medrano also suffered painful physical side effects of the separation because she was unable to breast feed her daughter.

92. As a direct and proximate result of Ms. Medrano's arrest and incarceration, Plaintiffs were deprived of their constitutionally protected rights.

## COUNT ONE
**VIOLATION OF 42 U.S.C. § 1983 (RIGHT TO BE FREE FROM UNREASONABLE SEIZURES)**

93. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 89 as though fully set forth herein.

94. Ms. Medrano has a right under Fourth and Fourteenth Amendments of the United States Constitution to be free from unreasonable searches and seizures. U.S. Const. Amends. 4, 14.

95. Any seizure not supported by probable cause is inherently unreasonable. *Michigan v. Summers*, 452 U.S. 692, 699–700, 101 S. Ct. 2587, 2592–93 (1981).

96. At all times relevant herein, the Defendants were state actors and their conduct was subject to 42 U.S.C. §§ 1983, 1985, and 1988.[2]

97. Defendants deprived Ms. Medrano of her constitutionally protected civil rights.

---

[2] "Private persons, jointly engaged with state officials in the challenged action, are acting `under color' of law for purposes of Section 1983 actions." *Dennis v. Sparks*. 449 U.S. 24, 27-28 101 S. Ct. 183, (1980).

98. Defendants arrested Ms. Medrano for armed robbery, placed her in jail, and referred the matter for criminal prosecution.

99. Ms. Medrano was incarcerated for 81 days.

100. Ms. Medrano was separated from L.V. during that time.

101. At all times, Ms. Medrano complied with the investigation.

102. At the time of the investigation and her arrest, Ms. Medrano's physical appearance did not match the physical description of the unknown female suspect.

103. Neither Officer Diventi, Officer Hough, nor Mr. Bains positively identified Ms. Medrano in-person as the female suspect in the Circle K armed robbery.

104. Neither Officer Diventi, Officer Hough nor Mr. Bains identified Ms. Medrano as the female suspect in the Circle K armed robbery based on a then-current photo.

105. Fingerprints were taken from the scene and PPD had a red Diamondbacks sweater believed to be worn by the female suspect in the Circle K armed robbery in evidence.

106. PPD had Ms. Medrano's fingerprints and DNA.

107. Despite these facts, PPD detained and charged Ms. Medrano without any corroborating DNA or fingerprint evidence.

108. PPD had no witness statements, admissions, or even genuine circumstantial evidence to connect Ms. Medrano to the Circle K armed robbery.

109. The only reliable eyewitness, Mr. Baines, did not positively identify Ms. Medrano in the photographic lineup or in person.

110. PPD's lead case agent admitted to Ms. Medrano's defense counsel that the PPD was "70% sure" that Ms. Medrano was *not* involved in the armed robbery.

111. At no time did PPD establish probable cause that Ms. Medrano was in any way involved in the armed robbery.

112. Defendants instituted and/or continued the criminal prosecution of Ms. Medrano without probable cause.

113. In November, 2011, the charges against Ms. Medrano were dismissed. Accordingly, the criminal prosecution terminated in her favor.

114. As a direct and proximate result of Defendants' acts and/or omissions under color of law, Plaintiffs suffered (without limitation) a deprivation of constitutional rights.

## COUNT TWO
### VIOLATION OF 42 U.S.C. § 1983 (RIGHT TO DUE PROCESS OF LAW)

115. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 113 as though fully set forth herein.

116. At all relevant times herein, Ms. Medrano had a right under the due process and equal protection clauses of the United States and Arizona constitutions not to be deprived of her constitutionally protected interest in her liberty. U.S.C. Const. Amends. 5, 14; Ariz. Const. Art. II, § 4.

117. At all times relevant herein, the Defendants were state actors and their conduct was subject to 42 U.S.C. §§ 1983, 1985, and 1988.

118. Defendants' conduct denied Ms. Medrano due process of law.

119. Defendants unlawfully imprisoned Ms. Medrano and separated her from her newborn daughter for 81 days.

120. Defendants knew or should have known that Ms. Medrano was not the unknown female suspect involved in the Circle K armed robbery.

121. PPD has evidence implicating another suspect, Ms. Ruelas, but has yet to file charges or seek an arrest.

122. Defendants' blatant disregard for Ms. Medrano's innocence and the lack of probable cause "shocks the conscience" and is so offensive to the "concept of ordered liberty" that it has deprived Ms. Medrano of her right to due process of law. *Baker v. McCollan*, 443 U.S. 137, 147, 99 S. Ct. 2689, 2696 (1979) (citing *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 151 (1937)).

123. As a direct and proximate result of Defendants' acts and/or omissions under color of law, Plaintiffs suffered (without limitation) a deprivation of constitutional rights.

## COUNT THREE
### MUNICIPAL LIABILITY UNDER *MONELL*

124. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 122 as though fully set forth herein.

125. Defendants were, at all times relevant, agents of the City of Phoenix.

126. Defendants acted, upon information and belief, in execution of government policy or custom that may fairly be said to represent official policy. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694–95, 98 S.Ct. 2018, 2037–38 (1978).

127. As a direct and proximate result of Defendants' acts and/or omissions pursuant to official government policy, Plaintiffs suffered (without limitation) a deprivation of constitutional rights.

## COUNT FOUR
### FAILURE TO ADEQUATELY TRAIN AND SUPERVISE

128. Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 126 as though fully set forth herein.

129. Adequately trained police officers adhere to rigorous investigative techniques to adequately identify criminal suspects prior to arrest.

130. Such techniques include (without limitation) objective photographic or in-person lineup identifications.

131. Police officers are regularly required to identify unknown criminal suspects.

132. It is obvious that inadequate training in identifying criminal suspects is likely to result in the violation of constitutional rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 1205 (1989).

133. Of the six PPD officers involved in this case, none adhered to standard investigative policies to adequately identify Ms. Medrano as the unknown female suspect.

134. PPD officers Hough and Diventi did not review the surveillance video to confirm that Ms. Medrano indeed looked like the female accomplice to the armed robbery.

135. PPD's investigators never asked the only eye witness to the robbery, Mr.

Bains, if Ms. Medrano, as she appeared on May 23, 2011, resembled the female accomplice to the armed robbery.

136. In fact, Mr. Baines selected an entirely different person in the photographic lineup that contained a photo of Ms. Medrano.

137. This was the sole photographic lineup used in the "investigation" that led to Ms. Medrano's wrongful arrest.

138. The only "identifications" of Ms. Medrano were based on a four-year-old MVD photograph shown to PPD officers by itself and without comparison to the surveillance footage.

139. At the time of arrest, Ms. Medrano resembled neither the unknown suspect in the surveillance footage nor her own four-year-old MVD photograph.

140. Defendants' acts and/or omissions fall short of adequate criminal identification techniques.

141. The policymakers of the City of Phoenix "can reasonably be said to have been deliberately indifferent to the need" for adequately training police officers to conduct criminal identifications without violating the constitutional rights of individual suspects. *Id.*

**WHEREFORE**, Plaintiffs request that the Court enter judgment against Defendants providing the following relief:

    A. Compensatory damages in an amount to be determined by the jury;

    B. Punitive/exemplary damages;

    C. An order enjoining/restraining Defendants from acts of retaliation.

    D. An award of interest, costs, and reasonable attorney's fees;

    E. Any and all other remedies provided pursuant to 42 U.S.C. § 1983; and

    F. All such other relief as the Court may deem just and proper.

/ / /

DATED: May 22, 2013.

                AIKEN SCHENK HAWKINS & RICCIARDI P.C.


                By /s/ Stephanie McCoy Loquvam
                  Alfred W. Ricciardi
                  James M. Cool
                  Stephanie McCoy Loquvam
                  *Attorneys for Plaintiffs Estella Medrano and L.V.*

## **CERTIFICATE OF SERVICE**

  I hereby certify that on 22nd day of May, 2013, I electronically transmitted this document to the Clerk's Office using the CM/ECF System for filing.

            /s/ Roonie McFarland
            Roonie McFarland